**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00467 (JEB)** |
| **v.** | : | |
| | : | |
| **ERIK RAU,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Erik Rau to four months' incarceration and $500 in restitution.

**I.     Introduction**

The defendant, Erik Rau, and his codefendant, Derek Jancart,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Erik Rau pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building. As explained herein, a substantial jail sentence is appropriate in this case because (1) the defendant prepared for violence by bringing Kevlar-lined gloves and a medical kit to Washington, D.C.; (2) he was aware of the potential for violence because he responded to the Capitol only after Jancart heard it had been "breached" and he scaled a bicycle rack as a ladder to

---

[1] Separately charged in *United States v. Jancart*, 21-cr-148, and also scheduled to be sentenced on September 29, 2021.

1

reach the Capitol; (3) he encouraged and incited violence by screaming "we have you surrounded" to the police while the forward line of the rioters broke through the police line; (4) he penetrated the U.S. Capitol all the way to the Speaker's conference room; and (5) he then deleted evidence from his cell phone of his participation in the January 6 riot.

Prior to entering the U.S. Capitol, Rau encouraged and celebrated the violence of that day, as shown by a video recording made by Rau of the horde of rioters surging up the stairs of the Capitol. *See* Exhibit 1. In that video, Rau can be heard screaming, "we have the police surrounded!" and "we have you surrounded!" while other rioters stormed the stairs of the Capitol. In the background of the video, other rioters can be heard screaming, "traitors gonna hang!" When the rioters broke through the police line, Rau can be heard screaming his encouragement and celebration, "Go, Go, Go!" and "Yeah! They just pushed through the guards!" Rau and Jancart then advanced on the Capitol, entering through the Senate Door exactly five minutes after an adjacent window was first breached by a rioter smashing through it with a stolen riot shield. They walked past the shattered glass and penetrated further into the U.S. Capitol until they arrived at Speaker Pelosi's conference room where Rau overheard another rioter shouting to "shit on her desk." Undeterred by that behavior, they continued deeper into the U.S. Capitol until finally a police officer had to bodily place her hands on Rau's backpack to direct him out of the Capitol.

The government recognizes that Erik Rau did not personally engage in violence or property destruction and that he accepted responsibility early. However, the Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that actually succeeded in

halting the Congressional certification combined with the defendant's preparation for violence, his celebration and incitement of the violence on that day, his successful penetration deep into the Capitol, and his destruction of evidence renders a significant jail sentence both necessary and appropriate in this case.

## II.       Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 9 (Statement of Offense) at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Erik Rau's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Erik Rau and Derek Jancart traveled to Washington, D.C., from their homes in Ohio to attend the "Stop the Steal" rally. They were prepared for possible violence. Derek Jancart brought a gas mask. *See United States v. Jancart,* 21-CR-148 ECF 21 at ¶ 8. Rau brought a medical kit and Kevlar-lined gloves and wore tactical pants. Jancart also brought two-way radios.

After attending the former President's rally, Jancart and Rau returned to their hotel room. According to an interview of Jancart, they left the hotel room after receiving an alert that the "Capitol had been breached." Jancart and Rau joined the crowd advancing on the U.S. Capitol.

Rau and Jancart watched from the West Lawn while rioters broke through the police line and rushed up the stairs of the U.S. Capitol. Rau video-taped the moment and can be heard screaming on the video, "We made it up to the Capitol. . . . We have the police surrounded! We

have you surrounded!" *See* Exhibit 1.[2] In the background of the video, rioters can be heard screaming, "get him!" and "traitors gonna hang!" When the rioters broke through the police line, Rau can be heard screaming his encouragement and celebration, "Go, Go, Go!" and "Yeah! They just pushed through the guards!" *Id.* Jancart later obtained that video, presumably from Rau, and posted it to Facebook.

Rau and Jancart than approached the Capitol where, per the proffer with Rau, they used a bicycle rack that was propped on its side to scale a wall. Shortly thereafter, Rau and Jancart entered the Capitol Building through the Senate Door exactly five minutes after the window immediately adjacent to the door was smashed out using a riot shield. The U.S. Capitol was first breached in this location by a rioter who jumped through the window over the broken glass:



---

[2] This video was seized from Erik Rau's Google account pursuant to a search warrant served on Google as well as Derek Jancart's Facebook account pursuant to a search warrant served on Facebook.

Exactly five minutes after the entry depicted above, Rau and Jancart entered the U.S.

Capitol through the Senate Door.[3]



They turned to the right and walked past the shattered glass on the floor from the smashed-

in window. From there, Rau and Jancart traveled through the Crypt. *Id.* at ¶ 10.



---

[3] Both Rau and Jancart claim that a police officer waved them into the building. The government has identified no evidence to support that contention and Rau readily admitted during his proffer that the "police officer" could have been a rioter in tactical gear.

After exiting the Crypt, Rau and Jancart took the stairwell south of the Crypt to the second floor of the Capitol and walked towards the Speaker's conference room. Rau stepped inside of the Speaker's conference room while Jancart stayed outside and took a photo. *Id.* at ¶ 10. Rau stayed inside the Speaker's conference room for approximately 15 seconds.  During a voluntary proffer with the government, Rau admitted to hearing rioters in the Speaker's conference room discussing breaking into a glass cabinet and taking everything in it and hearing a rioter screaming to "shit on her desk."



Jancart then posted the photo of the door to the Speaker's conference room to Facebook with the caption, "We're In[.]" *Id.* at ¶ 11.



Rau and Jancart then walked through Statuary Hall. After leaving Statuary Hall, Rau and Jancart walked past the entrance to the House Chamber and exited through a Southeast exit of the Capitol only after being instructed by officers to leave. *Id.* at ¶ 12. The footage below shows Jancart gesticulating to a police officer while another officer bodily pushes Rau to an exit.



In total, Jancart and Rau spent nearly 40 minutes inside of the Capitol. Both Rau and Jancart have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Erik Rau's Interview and Self Surrender*

After the arrest of Derek Jancart, Erik Rau contacted the U.S. Marshal Service in an attempt to turn himself in. Thereafter, he participated in a voluntary proffer with the FBI and the U.S. Attorney's Office and he voluntarily turned over his cell phone and the clothing that he was wearing on January 6. What follows is a summary of Rau's proffer to the FBI.

Rau told the FBI that he joined Jancart to attend the "Stop the Steal" rally in order to "make our voices heard." Rau claimed that because protests sometimes involve tear gas, Rau decided to bring a medical kit and Kevlar gloves. Rau also wore tactical pants and a hat that said, "I lubricate my guns with liberal tears." Jancart brought two-way radios. On the morning of January 6, 2021, Rau and Jancart attended the rally. They heard Donald Trump Jr. and former President Donald Trump speak. They left approximately 15 minutes before the speech was over and returned to their hotel room. Jancart then told Rau that everyone was headed to the Capitol and they decided to go to the Capitol.[4] Rau claimed that they walked past what looked like a giant pool of blood. Rau saw people up on the stairs and on the scaffolding. Rau saw a line of police officers and heard other rioters say to spread out. They went to their left, around the trees, and Rau saw other rioters go behind the trees and behind the officers. Rau admitted to taking a video from there. Then, during filming, Rau stated the officers took off running up the stairs and

---

[4] Jancart admitted, during a post-arrest interview with the FBI, that they traveled to the Capitol after hearing it had been "breached."

everyone else started running up the stairs and he stopped the recording. This video was likely Exhibit 1, discussed *supra.* Rau stated that they moved to the bottom of a wall, against which someone had laid the bicycle fencing. They used the bicycle fence as a ladder to scale the wall and from there found themselves on the steps of the Capitol.

Rau first claimed that a police officer waved them into the Capitol. When pressed, he admitted that it could have been a civilian wearing combat gear. They entered the Capitol, which was "stuffed with people." They traveled through the Capitol and passed someone directing rioters to split up inside of the Capitol. They eventually approached a room labeled "Speaker of the House." Jancart took a photo and Rau took two steps inside and looked around – there were glasses of water left on the table. People were "saying insane stuff." Rau admitted to hearing other rioters discussing smashing a cabinet and stealing things and taking a "shit on her desk." They left the conference room and Rau recalled hearing people screaming that someone had been shot. Rau claims that a police officer told him it was time to go and placed her hand on his backpack to escort him out. Rau described seeing another rioter then fight with that female police officer.

Rau admitted to deleting text message threads from his cell phone including the text message thread with Jancart as well as photographs contained in other text message threads. This is corroborated by the FBI's analysis of Rau's cell phone; the FBI was unable to locate Exhibit 1 on Rau's phone although it was filmed on his phone. It was, instead, seized from search warrants on Rau's Google account and Jancart's Facebook account.

*The Charges and Plea Agreement*

On July 13, 2021, Erik Rau was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 23, 2021, he pleaded guilty

to Count Three of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building. By plea agreement, Derek Jancart agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(D). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, the factors all weigh in favor of incarceration, as discussed below. The Court should also consider the Defendant's conduct after Jancart's arrest when fashioning a just sentence.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Rau was prepared for violence when he traveled to Washington, D.C. He brought Kevlar-lined gloves, wore tactical pants, and carried a medical kit. When Jancart and Rau descended on the Capitol, they knew that it would be violent. They traveled to the U.S. Capitol Building from their hotel room only after learning that the Capitol had been "breached." He approached the Capitol building by climbing a bicycle rack as a ladder to scale a wall. Rau entered the Capitol

11

building approximately five minutes after it was first breached at his location of entry. While no police officers blocked his path, there were clear signs of violent entry. The window adjacent to the door through which Rau passed had just been smashed out. Rau and Jancart walked directly by a pile of shattered glass on the ground as they moved deeper into the U.S. Capitol. They would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm. They were aware that tear gas had been deployed.

Rau both incited and celebrated the violence that was required to break through the police line. When Rau screamed "we have you surrounded!" he was screaming towards police officers who were outnumbered by at least a hundred to one, and who were engaged in hand-to-hand combat with rioters attempting to break the line.

While Rau himself did not participate in that physical attack, he screamed threatening language to police officers and celebrated the violence. Jancart, too, can be heard yelling "get him!" on the video. When the line is broken, Rau and Jancart start screaming, "go, go, go!" and "they just pushed through the guards!" Exhibit 1 encapsulates Rau's posture on that day – he incited, encouraged, and celebrated the violence, and then capitalized on it by unlawfully entering the Capitol in its wake.

Rau admitted to having destroyed evidence by deleting photos and text messages from his cell phone after the riot.

Rau spent approximately 40 minutes inside of the Capitol and he did not stop at the Rotunda, but instead moved deeper into the U.S. Capitol until he and Jancart came all the way to the conference room of the Speaker of the House. They were undeterred by other rioters screaming to "shit on her desk" and instead continued even further into the U.S. Capitol until they encountered

police officers who specifically told them to leave and, based on the video footage, physically placed a hand on Erik Rau in order to escort him out of the building.

That said, after the arrest of Jancart and search of his home, Rau took immediate steps to turn himself into the FBI. He participated in a voluntary proffer and provided his clothing and cell phone to investigators. Although he did not provide a full-throated apology for his actions, the tenor of his proffer was one of contrition and regret. Rau accepted the first plea offer presented to him and was one of the very first Capitol Riot defendants to plead guilty.

Accordingly, as described above, although the Defendant should be lauded for turning himself in to the FBI and taking responsibility, the nature and circumstances of the offense impel a significant sentence of incarceration.

**B.  The History and Characteristics of the Defendant**

As set forth in the PSR, Erik Rau's criminal history consists of several juvenile offenses, a misdemeanor traffic conviction for refusing to provide his driver's license to a deputy sheriff and refusing to exit his vehicle, and a misdemeanor conviction for assault for domestic violence for which he was sentenced on May 13, 2019 to 180 days with 178 days suspended and two years of probation. Accordingly, the defendant was on probation for domestic violence assault when he committed the offense for which he is now being sentenced. The defendant's commission of the instant offense while on probation raises a serious concern for future criminal conduct, as does the fact that the defendant has a criminal history that includes a violent offense.

Notwithstanding the conviction for domestic violence related assault, the Defendant's parents and wife report that he is a dedicated son, husband, and father, with a strong work ethic. He appears to have had a good childhood and he has the support of his family. He has maintained

employment and he provides support for his family. Additionally, Rau has been compliant with conditions of pretrial release during the pendency of this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

After the arrest of his co-defendant, Derek Jancart, Erik Rau called the U.S. Marshal Service in an attempt to turn himself into the FBI. He voluntarily participated in a proffer with the

FBI and the U.S. Attorney's Office and voluntarily turned over the clothing worn on January 6 and his cell phone and he consented to a search of his cell phone. When asked how he would do things differently, he told the FBI that given the chance to do it again, he would not come to Washington, D.C. on January 6. Although he first claimed that he was waved in by a police officer, he relented and admitted that it could have been a rioter in tactical gear and not an actual police officer. The Defendant accepted the first plea offer that was offered to him. Accordingly, here, the goal of specific deterrence will be largely satisfied by this prosecution.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default. Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19.

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.

16

Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in the former category. The defendant came to D.C. prepared with Kevlar-lined gloves and a medical kit, converged on the Capitol after learning it was "breached," ascended a wall outside of the Capitol using a bicycle rack as a ladder, spent 40 minutes inside the Capitol and penetrated all the way to the Speaker's conference room, celebrated and incited the violence required to breach the Capitol, and destroyed evidence prior to turning himself in. Thus, this defendant should not be compared to those who obtained a home confinement or probationary sentence.

Here, to avoid unwarranted sentencing disparities, the Court must consider the sentence imposed on Derek Jancart when imposing a sentence for Erik Rau. As of the filing of this memorandum, Derek Jancart is scheduled to be sentenced immediately prior to Erik Rau. Although they participated in the Capitol Riot together, there are some important differences between Jancart's and Rau's conduct and characteristics. Rau's conduct on January 6 was more egregious than Jancart's, as revealed by Exhibit 1: it was Rau who screamed "we have you surrounded!" towards the police officers and it was Rau who screamed "go, go, go!" and "yeah, they just pushed through the guards!" These threatening statements are akin to inciting a riot and contributed to the environment of terror on that day. On the other hand, Jancart posted the same video to Facebook, essentially sponsoring its content, and he can be heard laughing and cheering in the video. Further, multiple search warrants in this case did not reveal the kind of propaganda and minimization of the violence by Erik Rau that appear in Derek Jancart's Facebook account. Finally, Erik Rau turned himself in immediately after Jancart's arrest and voluntarily provided a proffer, his clothing, as

17

well as his cell phone. However, Rau only turned himself in *after* learning that Derek Jancart had been arrested and his home searched by federal agents. Erik Rau's proffer was substantially more conciliatory and remorseful than the interview provided by Derek Jancart at the time of his arrest. Both Erik Rau and Derek Jancart both accepted the first plea offer extended to them, rendering them some of the first Capitol Riot defendants to plead guilty. Accordingly, although Rau's conduct on January 6 was more egregious than Derek Jancart's based on the conduct captured in Exhibit 1, his conduct after Derek Jancart's arrest – both his cooperation with the prosecution and lack of social media postings – is sufficiently mitigating that the government is recommending a sentence of four months' incarceration for both defendants.

At this time, no unwarranted sentencing disparities exist, nor does the government's request create one.

## V.    Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Erik Rau to four months' incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:   LESLIE A. GOEMAAT
      MA Bar No. 676695
      Assistant United States Attorney
      Fraud Section
      U.S. Attorney's Office
      555 4th Street, N.W., Room 5840
      Washington, D.C.  20530
      Office: 202-803-1608
      Leslie.Goemaat@usdoj.gov