## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | **Case No. 21-467 (JEB)** |
| **v.** | | |
| | ) | |
| **ERIK RAU** | ) | |

_____

### ERIK RAU'S MEMORANDUM IN AID OF SENTENCING

Mr. Rau, through undersigned counsel, submits this memorandum in aid of his sentencing hearing scheduled to occur on September 29, 2021.  It is of utmost importance to Mr. Rau that this Court and the public understand that he is incredibly remorseful for his actions on January 6, 2021.  There is no doubt that, as he expressed when interviewed by law enforcement, he wishes he had never come to Washington, D.C. on that day.  He came at the invitation of his friend, Derek Jancart, who had already made hotel reservations and plans to attend the Trump rally.  But for the invitation by Mr. Jancart, Mr. Rau would never have come to D.C. and would not have put himself in the position of potentially causing so much damage to his family by his reckless and criminal conduct.  Mr. Rau does not blame Mr Jancart – he is a grown man who made the bad decisions he made that day which have placed him and his family in peril.  We point this out only to show that it was not a preplanned event and that it was outside his character to have acted this way.

To his credit, Mr. Rau turned himself into law enforcement, voluntarily debriefed with law enforcement about his conduct that day, fully acknowledged all of his misconduct, expressed true and full contrition, and voluntarily turned over evidence including the clothing he wore on

January 6, his phone, and information about the videos and photos he took that day.  He
acknowledged that he previously had sent videos to Mr. Jancart and had deleted them from his
phone.  Nevertheless, he truthfully described to the best of his ability the videos he took, and the
government was able to obtain them with a search warrant.  Mr. Rau fully acknowledges that he
behaved foolishly outside of the Capitol building, and made a grave mistake in entering the
Capitol.  He is embarrassed about his conduct and makes no excuses.  He stands ready to accept
the consequences for his behavior but asks the Court to consider the impact that any sentence
imposed will have on his wife and his three young boys.  They have already been impacted by
his actions and he wants nothing more than to protect them from further harm.

This Court must impose a sentence that is "sufficient, but not greater than necessary, to
comply with the purposes [of sentencing]."  18 U.S.C. §3553(a) (emphasis added).  In this case,
understanding the full gravity of what occurred on January 6, 2021, and Mr. Rau's role in those
events, nevertheless Mr. Rau requests that the Court impose a non-custodial sentence in line with
that recommended by the United States Probation Office.  Mr. Rau makes this request not so
much for himself, but for his family who would be substantially impacted by any period
incarceration.

Mr. Rau is a devoted son, husband and father.  He is a second-generation steel worker
who has worked in the steel mill for several years.  His father has worked for the steel mill for 29
years.  His wife has a photography business and a home décor business, both of which have
suffered from the pandemic and from the negative publicity surrounding this case.  Together, Mr.
Rau and his wife run a small farm on approximately 6 acres of land where they raise pigs, goats,
chickens and dogs.  They lead a peaceful country life raising their three young, very-active boys.
Mr. Rau works the night shift at the steel mill, then returns home in the morning to take his

oldest son, just 5 years old, to school.  Two days each week he also takes his middle son to preschool.  He spends the day caring for the three boys who enjoy swinging in the backyard, go-karting and dirt-biking on their property.  The boys spend most of the day outside supervised by their father as his wife is often out of the home doing photoshoots and sales.  Very little time, outside of sleeping and eating, is spent inside the home.

Were this Court to adopt the government's recommendation instead of the recommendation of the Probation Office, Mr. Rau and his family would lose everything.  His income from the steel mill is their primary source of financial stability.  His wife would be unable to work because she would have to be the sole caretaker of their three boys.  They would be unable to maintain the farm and livestock as the boys are not old enough to take care of the property or animals.  There would be no one to drive to town to pick up the feed, no one to birh the now pregnant pig, and no one to do all of the necessary chores to keep a small farm going.  A period of incarceration would also likely cause Mr. Rau to lose his job at the steel mill, thus plummeting them into poverty.

Mr. Rau recognizes how serious the January 6 incident was and in no way attempts to minimize his involvement in it.  Nevertheless, his charge is a Class B misdemeanor for which probation is typically an appropriate sentence.  The sentencing guidelines do not even apply to misdemeanor offenses.  Indeed, many felony offenses fall within a range that allows for a probationary sentence.  He understands that many have expressed a view that the conduct of January 6 warrants incarceration despite the misdemeanor nature of the charge.

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation.  In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  Mr. Rau's likelihood of recidivism is very

low.  He has expressed genuine remorse and contrition, he turned himself in and cooperated fully

with law enforcement, he turned over evidence voluntarily, and he accepted the first plea offer

tendered with no hesitation.  His acceptance of responsibility was complete and without

reservation.  Thus, the purposes of sentencing that seem most at play are general deterrence and

punishment.

The public will be adequately deterred by the sentences meted out against those who

perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral

consequences attendant to even a misdemeanor conviction for the others involved.  Those who

would not be deterred by these consequences are likely not deterrable.  And, a sentence that

leaves a family impoverished when other reasonable alternatives exist would not promote respect

for the law.  Indeed, unnecessarily harsh sentences imposed upon those who were less culpable

will not encourage respect for the law or promote just punishment, but may in fact be counter-

productive.  A period of probation does constitute punishment as one's liberty interests are

curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms.

Mr. Rau urges the Court to adopt the Probation Office's recommendation in this case and impose

a probationary sentence in light of his significant family obligations, his sincere and complete

remorse, his early and consistent acceptance of responsibility, and the lack of a need to further

deter him.

The government offers several factors that it posits warrant a period of incarceration.

The government points to the incendiary remarks Mr. Rau made in the video he shot outside the

Capitol.  Mr. Rau makes no excuses for those remarks.  He was caught up in the moment and

was remarking on what was going on.  He recognizes that his words could have incited others

and for that he is deeply regretful.  He is embarrassed about that behavior and has expressed this

embarrassment to his friends and family.  He does not believe that these comments were appropriate, does not consider them to have been patriotic, and wishes more than anything he could go back in time and be wiser and more circumspect about what was going on.  When he saw what was happening, rather than go to the Capitol, he should have stayed at his hotel.  While he cannot change what he did, he can only sincerely apologize and say without hesitation that he will one day teach his sons the importance of not behaving in this manner.  The government also points to statements made by Mr. Jancart and suggests those statements shed light on Mr. Rau's intent.  That is not fair.  Mr. Jancart is a friend of Mr. Rau, but his statements are not those of Mr. Rau and any intent he may or may not have had should not be imputed to Mr. Rau.

The government concedes that Mr. Rau committed no violent acts and destroyed no property.  His actions within the Capitol have been tracked on the CCTV footage and this demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property, steal property, commit violent acts, or encourage others to do so.

Mr. Rau engaged in no pre-planning or coordination activities.  Indeed, he does not recall even knowing that the rally that was planned until Mr. Jancart invited him to accompany him to the rally.  He and Mr. Jancart left the rally before the speeches were over and returned to their hotel.  His fateful and rash decision to return to the Capitol with Mr. Jancart to see what was happening is his greatest regret.  He came to D.C. with the purpose of showing support for Mr. Trump, but he never intended to breach the Capitol and he never intended violence.  The government acknowledges he brought no weapons with him, but points to the fact that he had a medical kit and Kevlar lined gloves.  Mr. Rau acknowledged this in his interview with the FBI.  These items demonstrate that Mr. Rau understood there could be violence at the rally – in fact there had been violence at other rallys.  However, it does not suggest he was prepared to engage

in such violence.  Mr. Rau did not post on social media suggestions that he intended to engage in violence in any way, nor did he post braggadocious comments after the rally.  When he met with law enforcement after the event, he made no excuses for his behavior, was sincerely contrite, did not blame law enforcement for his predicament, and did not minimize his actions or rationalize them. While he recalled being waved into the Capitol (and indeed the video shows this) he acknowledged that the person waving him in could have been someone dressed in tactical gear, not a police officer.

Another factor to consider is that Mr. Rau accepted full responsibility very early on. While it is not appropriate to punish an individual for asserting their right to go to trial and to have the government held to its burden of proof, there is a societal benefit when people who have done wrong acknowledge that wrongdoing in a public way as Mr. Rau has done.  This has a deterrent effect on future wrongdoing and has a positive effect on others taking responsibility for their actions.  On the other hand, if people like Mr. Rau are punished so harshly that their families are destroyed, this will have the unintended consequence of suggesting to others who would otherwise accept responsibility for their actions that they should instead insist upon a trial. Mr. Rau did not obtain a significant benefit by pleading guilty – the only charges dropped were other misdemeanors.  Other than a sincere desire to accept responsibility and move on, there is little incentive to taking a plea over going to trial if there is little difference in the ultimate result.

On the issue of sentencing disparity, counsel appreciates that the government is attempting to set out meaningful distinctions in cases and some coherent rationale for the recommendations it makes.  However, those distinctions are not as clear as the government suggests, and there is no scientific formula that will lead to sentencing uniformity.  In a District with as many judges as this District has, there can be no definitive sentence that addresses the

unique facts and circumstances of each case.  Indeed, sentencing disparity is not prohibited, just

unwarranted sentencing disparity. The government cites comments made by several judges to the

effect that defendants who plead guilty to this offense should not assume probation is

appropriate, and those comments are well-taken.  However, in many of those cases, that was the

actual resulting sentence. The government cites several statements made by the Honorable Judge

Moss in a prior sentence about the effect of January 6 on our democracy, and it is hard to dispute

those statements.  But, in the case where he made those statements, he nevertheless departed

downward from the sentencing guidelines and imposed a sentence that was well-under that

which the government sought.

If this Court were to adopt the government's recommendation, as opposed to that of the

Probation Office, it would result in sentencing disparity with other individuals who were

similarly charged and behaved similarly.  From the information counsel has been able to review,

no one who has been sentenced to date has received a period of incarceration when they have

pleaded guilty to a misdemeanor arising out of the January 6 events with the exception of Karl

Dresch who had already served 6 months in pretrial detention, having been first charged with a

felony conviction.  *See United States v. Karl Dresch*, Crim. No. 21-0071(ABJ).

And, the government's recommendations in cases where they have made them, are not

necessarily consistent.  For example, the government has recommended 3 years of probation

with 2 months home confinement for Danielle Doyle who entered not through an open door but

through a broken window.  She is alleged to have yelled at officers inside the Capitol, and,

according to the government was not fully transparent in her interview with law enforcement.

*See United States v. Danielle Doyle*, Crim. No. 21-00234 (TNM).  It is hard to discern that the

disparity between a custodial sentence for Mr. Rau and non-custodial sentence for Ms. Doyle would be warranted.

The government has requested 2 months incarceration for Robert Reeder, half that requested for Mr. Rau.  The government alleges that Mr. Reeder bragged on social media about having engaged in battles with the police inside the Capitol, showed no remorse or contrition, claimed he had no idea he could not be in the Capitol despite being tear-gassed, recorded attacks on police officers inside the Capitol, entered a second time by forcing himself past police officers who were trying to clear the Capitol, posted videos bragging about his actions and deleted social media accounts.  Even after pleading guilty, according to the government, he portrayed himself as innocent victim of circumstances.  And yet, the government has recommended a more lenient sentence in that case.  *See United States v. Robert Reeder*, Crim. No. 21-166 (TFH).

Similarly, in the case of Jessica and Joshua Bustle, the government recommended probation with a short term of home confinement even though Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy.  *See United States v. Jessica and Joshua Bustle*, 21-00238 (TFH).   Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle.  *Id*.

The government has asked for probation with a period of home confinement for Mr. Andrew Bennett.  United States v. Andrew Bennett, Crim. No. 21-227 (JEB).  According to the government, Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct.  According to the government,

8

Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months.  He posted numerous times about conspiracy theories and a fraudulent election.  On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!".  On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer.  Bennett also filmed assaults on the police officers and continued to livestream events inside the building. None of this is to suggest that Mr. Bennett ought to receive a sentence of incarceration, only to suggest that the distinctions the government draws are hard to justify.

Counsel points to these examples not to criticize the government -- it is not an easy task to compare cases and draw appropriate distinctions – but rather to note that there is no perfect answer.  Largely because of his family obligations, Mr. Rau asks that the Court adopt the recommendation of the U.S. Probation Office and impose a 30-month term of probation.  In the alternative, he asks that the Court consider a non-custodial sentence with a restriction that he remain on his property except for work (including getting provisions for his animals) and excused absences to take his children to school, church, and medical appointments.  While this is not the typical home confinement scenario, because his home is a farm and thus requires him to be outside, he asks for this deviation from the norm.  In the end, this Court is faced with the task of meting out a just and appropriate sentence given all of the factors involved, and Mr. Rau places his trust in this Court to do just that.

Respectfully submitted,

A.  J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
MICHELLE PETERSON
Chief Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004